**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RICHARD E. STARKS, JR.,

     Petitioner,

v.                                                                    Case No. 8:23-cv-2757-WFJ-AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

**ORDER**

Richard E. Starks, Jr., a Florida prisoner, initiated this action by filing a *pro se*

petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a

response opposing the petition. (Doc. 35). Mr. Starks submitted a reply. (Doc. 43). After

careful review, the petition is **DENIED**.

**I.      Background**

This case arises from Mr. Starks's fatal beating of a guest at a house party in Pasco

County, Florida. A jury convicted Mr. Starks of second-degree murder for the beating, and

he received a sentence of thirty years' imprisonment. (Doc. 6-1, Ex. 3). The Second District

Court of Appeal ("Second DCA") affirmed the conviction in a written opinion. *Starks v.*

*State*, 223 So. 3d 1045, 1046-48 (Fla. 2d DCA 2017). It provided the following summary

of the evidence presented at trial:

> On a late Saturday evening [in July 2011], Starks was a guest at a house party
> in Pasco County along with the victim, Sam Smith. The victim was one of
> the first guests to arrive at the party, arriving at approximately 6:00 p.m.,

1

with both his fiancée and his younger sister. Starks arrived to the party later in the evening.

Immediately upon his arrival, Starks was hostile to the victim. Starks initially mistook the victim for someone named Brian, whom Starks disliked. Starks's demeanor toward the victim—who he thought was Brian—became loud and aggressive. The victim did not respond to Starks's hostility but instead tried to back out of the situation. Eventually the victim's identity was cleared up, but this incident was only the first in a series of Starks's provocations toward the victim.

Later in the evening, the victim commented that Starks was a "ginger"—a person with red hair. Starks took great offense to the label, even though he did not seem to understand what it meant, and he angrily confronted the victim a second time that evening. Starks indicated that he wanted the verbal confrontation to become physical, but the victim again declared that he did not want to fight Starks.

The third confrontation between Starks and the victim would prove to be fatal. Toward the end of the night, the victim was sitting in a plastic chair outside of the house, underneath a carport. The trial testimony reflects that, at this point in the festivities, Smith "had started drinking quite a bit" and had become "very incoherent, laying in the chair." Starks was also outside in the area where the victim was seated. The victim overheard the party's host speaking with the victim's fiancée. The victim interpreted this interaction as flirtation and made a comment to the host while still seated in the plastic chair. At that point, Starks inserted himself into the fray and told the victim not to "insult [his] friend like that."

The victim ignored Starks's third attempt at provocation that evening, but Starks nevertheless advanced toward the still-seated victim. The victim never attempted to put his hands up in defense, to get out of the chair, or to try and defend himself in any manner. One of the guests attempted to intercept Starks before he reached the victim, but Starks broke free and punched the seated victim on the left side of his face. Starks's first punch knocked the victim unconscious and the victim's body went limp in the plastic chair.

A guest then pulled Starks back from the victim's limp body, but Starks broke free a second time, landing a second series of punches to the head of the still-seated, still-unconscious, and still-limp victim. Yet again, a guest attempted to restrain Starks, but Starks broke loose for a third time, delivering a third series of punches to the defenseless victim's head. In total, Starks broke free from three attempts by partygoers to restrain him. The partygoers who

witnessed the entire attack testified that Starks landed between six and twelve punches to the victim's head, despite the victim appearing incoherently drunk prior to being hit and despite Starks's first punch having rendered the victim unconscious.

A party guest testified that, after Starks was pulled away from the victim a final time, she heard Starks repeatedly bragging about how he had "whooped" the victim.

The party's host then told Starks to leave and the host's girlfriend called 9-1-1. At the conclusion of Starks's series of attacks, the unconscious victim was slumped over in his chair, his face looked pale and bruised, his neck was awkwardly turned, his nose and mouth were bleeding, there was a pained expression on his face, and he did not appear to be breathing normally. The party's host attempted to perform CPR on the victim for approximately twenty minutes, until law enforcement officers and paramedics arrived at the scene at approximately 1:00 a.m.

A paramedic who responded to the incident testified that the victim was not breathing and had no neural activity but did have a faint heartbeat. The paramedic stated that the victim had blood around his mouth and nose, that the victim's jaw appeared broken, and that the orbits of the victim's eyes were bruised and swollen. The paramedic remarked that, due to the injuries to the victim's jaw, he did not require a laryngoscope to open the victim's mouth, which was "highly unusual." Instead, the paramedic merely used his hand and forefinger to pull the victim's injured jaw down and gain sight of the victim's vocal cords in order to place an artificial airway device.

The victim was transported to a hospital, arriving at approximately 3:00 a.m., and was pronounced dead soon after. When the party's host contacted Starks and informed him of the victim's death, Starks profanely indicated that he did not care. In fact, Starks tried to get one of the guests from the party to help set up an alibi for where Starks had been that night, but the guest refused to help Starks in that manner.

A medical examiner testified that the victim's cause of death was blunt trauma to the head and neck and that the manner of death was homicide. The examiner explained that he found multiple injuries to the victim's body, including a broken bone in the victim's neck, a cranial hemorrhage, and multiple soft-tissue injuries to the victim's face. . . . The examiner also opined that there was no way for the victim to suffer the variety of injuries that he suffered from just one punch. Instead, the examiner opined that the victim's

3

injuries were indicative of being punched at least three times or perhaps as many as one hundred times.

*Id.* at 1046-48.

After his unsuccessful direct appeal, Mr. Starks sought postconviction relief under Florida Rule of Criminal Procedure 3.850, arguing that his trial counsel was ineffective in several respects. (Doc. 35-3, Ex. 53). The postconviction court rejected Mr. Starks's claims in lengthy written orders, and the Second DCA affirmed without comment. (Doc. 6-1, Exs. 19, 22; Doc. 35-3, Ex. 54). Mr. Starks also filed two petitions alleging ineffective assistance of appellate counsel under Florida Rule of Appellate Procedure 9.141(d). (Doc. 6-1, Exs. 13, 17). Both were summarily denied. (*Id.*, Exs. 14, 18). This federal habeas petition followed. (Doc. 1).

## II.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

4

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The Second DCA affirmed Mr. Starks's conviction, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the

5

unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## B.      Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable

probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

###### C.    Ineffective Assistance of Counsel

Mr. Starks alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Starks must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Starks must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702

F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III.   Discussion[1]

### A.   Ground One—Failure to Investigate "True Cause of Death"

Mr. Starks faults trial counsel for failing to "fully investigate" the victim's "true cause of death." (Doc. 1 at 5). The medical examiner who testified at trial—Dr. Jon Thogmartin—opined that the victim died from "blunt head and neck trauma." (Doc. 35-2, Ex. 33, at 398). According to Dr. Thogmartin, the trauma caused "axonal injury"—the severing of the "wires that lead from the brain to the body." (*Id.* at 405). Dr. Thogmartin also testified that the injuries resulted from at least three punches and perhaps up to "a hundred." (*Id.* at 413). Dr. Thogmartin did not perform the autopsy of the victim. Instead,

---

[1] Respondent argues that the petition is untimely. (Docs. 6, 24). The Court need not address timeliness because "the petition fails on the merits." *McCormack v. Sec'y, Fla. Dep't of Corr.*, No. 22-14071, 2024 WL 3668519, at *1 (11th Cir. Aug. 6, 2024) ("[Petitioner] argues that his petition is both timely and meritorious. We need not decide whether [the] petition was timely because, even if it was, the petition fails on the merits."); *see also Day v. McDonough*, 547 U.S. 198, 205 (2006) (noting that AEDPA's statute of limitations "is not jurisdictional").

he reviewed the "photographs" and autopsy report prepared by Dr. Dollett White, who was unavailable to testify at trial. (*Id.* at 387; Doc. 35-3, Ex. 56, at 28).

According to Mr. Starks, counsel should have realized that both Dr. White and Dr. Edward Willey—an expert retained by the defense—concluded that the cause of death was a "ruptured vertebral artery," not an axonal injury.[2] (Doc. 35-3, Ex. 53, at 4-5). Armed with the "true" cause of death, counsel allegedly could have shown that the victim died either because he "was moved multiple times by individuals untrained in the medical profession" or "from the first . . . punch by Mr. Starks." (*Id.* at 6). Mr. Starks also alleges that counsel could have shown that "no scientific evidence" supported Dr. Thogmartin's claim that the victim was "beaten/pummeled" to death. (Doc. 1 at 5).

The postconviction court rejected this claim. (Doc. 6-1, Ex. 19, at 3-4). It noted that "Dr. Thogmartin's opinion regarding the cause of the victim's death was based on the injuries recorded by Dr. White during the autopsy she performed." (*Id.* at 3). At trial, Dr. Thogmartin rejected Dr. White's theory that the victim suffered a "tear in [his] vertebral artery," finding instead that "axonal injury likely caused [his] death." (*Id.*) The court acknowledged that Dr. Willey—the defense expert—"agree[d] with Dr. White's conclusion that the victim sustained a torn vertebral artery." (*Id.* at 4). But the court found that "regardless [of whether] the victim sustained axonal injuries . . . or a torn vertebral artery, both Dr. Thogmartin and Dr. White determined, and the autopsy report certified, that the victim's cause of death was blunt head and neck trauma." (*Id.*) Moreover, Dr.

---

[2] Dr. Willey did not testify at trial.

Willey's "opinion [was] not inconsistent with th[e] finding" of blunt force trauma, which was supported by "[w]itness testimony that [Mr. Starks] struck the victim numerous times." (*Id.*) As for the allegation that the victim's "injuries were caused by untrained individuals moving him," the court pointed to witness testimony "that the victim did not have a pulse and was turning blue before he was moved from the chair in an effort to perform CPR." (*Id.*) Thus, the court held that Mr. Starks "failed to demonstrate" that he suffered prejudice from counsel's failure to investigate and present additional evidence of the victim's cause of death. (*Id.*)

This ruling was reasonable. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [the Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Starks]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. Starks cannot make the required showing. As the postconviction court explained, both Dr. White and Dr. Willey concluded that the victim suffered a ruptured vertebral artery. (Doc. 35-3, Ex. 53, at 5; Doc. 35-3, Ex. 55, at 1462-66). Those findings

were consistent with Dr. Thogmartin's opinion that the victim died of "blunt head and neck trauma" after sustaining at least three punches. (Doc. 35-2, Ex. 33, at 398, 413). Indeed, Dr. White testified that blunt force trauma was the cause of death, concluding that the victim was hit "more than once." (Doc. 35-3, Ex. 55, at 1471). The finding of blunt force trauma was supported by testimony from several eyewitnesses who saw Mr. Starks "str[ike] the victim numerous times." (Doc. 6-1, Ex. 19, at 4). And Mr. Starks himself alleged in his Rule 3.850 motion that a ruptured vertebral artery could result from "a sudden injury to the neck." (Doc. 35-3, Ex. 53, at 5). By contrast, nothing in the record supports Mr. Starks's conjecture that the victim died "from the first . . . punch" or because he "was moved multiple times by individuals untrained in the medical profession." (*Id.* at 6). As the postconviction court noted, several "witnesses testified that the victim did not have a pulse and was turning blue before he was moved from the chair in an effort to perform CPR." (Doc. 6-1, Ex. 19, at 4). Additionally, Dr. Thogmartin opined that "in and of itself, a move wouldn't affect [the victim] at all." (Doc. 35-2, Ex. 33, at 407).

Thus, even if the jury had learned of the alternative theory that the victim suffered a ruptured vertebral artery, the evidence still would have shown that the cause of death was blunt force trauma. Mr. Starks cannot establish prejudice from the failure to present testimony that would not have aided his defense. *See Henderson v. Solomon*, No. 3:04-cv-206-TJC-HTS, 2006 WL 4757826, at *18 (M.D. Fla. Oct. 24, 2006) (no *Strickland* prejudice where proposed "testimony would not have helped [the] defense").

**B.      Grounds Two and Three—Failure to "Present a Coherent Defense" and Advice Not to Testify**

Mr. Starks argues that trial counsel was ineffective for failing to present a "coherent defense" and for advising him not to testify. (Doc. 1 at 8-9). According to Mr. Starks, counsel should have argued that he acted in self-defense when he punched the victim to death. (Doc. 35-3, Ex. 53, at 11-12). To establish his claim of self-defense, Mr. Starks allegedly needed to testify that he "reacted out of fear to an aggressive comment from the [victim] and not out of ill will." (Doc. 1 at 9). Counsel also could have presented the victim's Facebook page, which stated that "full contact fighting is a sport he enjoys . . . play[ing]." (Doc. 35-3, Ex. 53, at 11). Despite this evidence, counsel advised Mr. Starks not to testify, which supposedly deprived him of a "coherent defense." (Doc. 1 at 9).

The postconviction court rejected this claim for lack of prejudice. (Doc. 6-1, Ex. 19, at 7-8; Doc. 35-3, Ex. 54, at 6). It found that "nothing, including [Mr. Starks's] proposed testimony, would have supported a claim of self-defense." (Doc. 6-1, Ex. 19, at 7). The court noted that at trial, "Johnnie Pool [a partygoer] testified that [Mr. Starks] was verbally aggressive toward the victim." (*Id.*) Moreover, several other guests—Crystal Ertell, Carly Richards, Kaela Anderson, as well as Christopher, Jason, and Phillip Wansor—"all testified that [Mr. Starks] and the victim were having verbal arguments throughout the night." (*Id.*) But, as the court noted, "Johnnie Pool, Crystal Ertell, and Jason Wansor testified that [Mr. Starks] struck the victim while the victim was sitting in a chair." (*Id.*) They also "testified that the victim never got up or tried to defen[d] himself in any manner." (*Id.*) Based on this testimony, the court found no "reasonable probability that the outcome

12

of the trial would have been different had [Mr. Starks] testified that the victim 'said something aggressive toward [him]' before he struck the victim." (*Id.* at 8).

As for the Facebook page, the court found no prejudice from "counsel's failure to introduce additional evidence of the victim's boxing or fighting hobby." (Doc. 35-3, Ex. 54, at 6). In the court's view, any such evidence would have been cumulative because the jury already learned from two witnesses that "the victim boxed and did mixed martial arts for fun." (*Id.*) Thus, there was no reasonable probability of a different outcome at trial had counsel shown that "the victim's Facebook page indicated that he enjoyed the sport of full contact fighting." (*Id.*)

The postconviction court reasonably found no prejudice. The jury was instructed that Mr. Starks's use of force was "justified" only if he "reasonably believed that such conduct was necessary to defend himself against [the victim's] imminent use of unlawful force against [him]." (Doc. 35-2, Ex. 38, at 4). Nothing in the record suggests that Mr. Starks reasonably believed that punching the victim was necessary to defend himself. As the postconviction court explained, Mr. Starks "attacked" the "intoxicated victim" as he "sat in a plastic chair," "landing a series of punches to his face and neck." (Doc. 6-1, Ex. 19, at 2). The victim "never attempted to get out of the chair or defend himself in any manner, and the first punch appeared to render him unconscious. Witnesses attempted to separate [Mr. Starks] from the unconscious victim, but [he] was able to break free and land several more blows." (*Id.*) Even if Mr. Starks had testified that the victim made "an aggressive comment," there is no reasonable probability that the jury would have accepted his claim of self-defense. *See Santiago v. Sec'y, Dep't of Corr.*, 723 F. App'x 896, 904

13

(11th Cir. 2018) (state court reasonably found no prejudice from failure to properly instruct jury on self-defense because petitioner "had an extremely weak self-defense theory").

Likewise, the postconviction court reasonably found that the victim's Facebook page would have been cumulative. "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002). "[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014) (quoting *Holsey v. Warden*, 694 F.3d 1230, 1260-61 (11th Cir. 2012)). As the postconviction court noted, one witness testified at trial that the victim pursued "mixed martial arts" and "UFC fighting" as a hobby, "but not professionally." (Doc. 35-2, Ex. 33, at 319). Another witness stated that he had seen the victim "box" a "few times." (*Id.* at 292-93). Thus, a fairminded jurist could agree that additional evidence of the victim's interest in boxing would have been cumulative.

### C.    Ground Four—Failure to Call Witnesses at Trial

Mr. Starks contends that trial counsel was deficient for failing to call several witnesses at trial. (Doc. 1 at 11). In his Rule 3.850 motion, Mr. Starks identified nine witnesses who allegedly could have supported his defense. (Doc. 35-3, Ex. 53, at 16-22). The postconviction court thoroughly reviewed each witness's proposed testimony, concluding that none would have created a reasonable probability of a different outcome

14

at trial. (Doc. 6-1, Ex. 19, at 8-17). As explained below, Mr. Starks cannot show that this ruling "was so obviously wrong that [the] error lies beyond any possibility for fairminded disagreement." *Mungin*, 89 F.4th at 1317.

First, the postconviction court reasonably found no prejudice from the failure to call Maria Pepe, Rheannon Bahneman, Jamie Smith, Jenna Tucker, Heather Hart, or Erica Lisk. (Doc. 6-1, Ex. 19, at 8-14). Each of these persons attended the party where the murder occurred. During her deposition, Ms. Pepe "testified that the victim told [Mr. Starks] on a couple occasions that he did not want to fight." (*Id.* at 9). Nevertheless, according to Ms. Pepe, Mr. Starks "struck the victim in the face multiple times while the victim was seated in a chair." (*Id.*) Ms. Bahneman stated during her deposition that "the victim told [Mr. Starks] that he did not want to fight him." (*Id.* at 10). Ms. Bahneman also said that she "did not witness . . . the attack." (*Id.*) A fairminded jurist could agree that there was no "reasonable probability that the outcome of the trial would have been different had counsel called [Ms. Pepe or] Ms. Bahneman to testify at trial." (*Id.*)

During her deposition, Ms. Smith testified that Mr. Starks "stated that he wanted to fight the victim, but the victim said he did not want to fight." (*Id.* at 11). She also claimed that although "she did not witness [Mr. Starks] strike the victim," "when she exited the house, she could see the victim lifeless in a chair, and Jason and Phillip Wansor were holding [Mr. Starks] back." (*Id.*) The postconviction court reasonably concluded that "Ms. Smith's testimony would not have supported [Mr. Starks's] theory that he acted in self-defense, and it would not have cast doubt on the testimony of the witnesses [who] testified at trial." (*Id.*)

As for Ms. Tucker, she testified at her deposition that "the victim indicated that he would fight [Mr. Starks], [but] he did not mean it in an aggressive way." (*Id.* at 12). According to Ms. Tucker, "the victim and his friends would often put on gloves and engage in friendly boxing matches." (*Id.*) Ms. Tucker stated that "the victim told [Mr. Starks] that he did not want to fight him, and they hugged." (*Id.*) Approximately "fifteen minutes later," however, a guest "came in [the house] and yelled that the victim was unconscious." (*Id.*) A fairminded jurist could agree that Mr. Starks suffered no prejudice from the failure to call Ms. Tucker at trial, particularly given her "deposition testimony that the victim told [Mr. Starks] that he did not want to fight and that they had cleared up any misunderstanding regarding the nature of the fight the victim was suggesting." (*Id.*) As for Ms. Tucker's statement that the victim "would fight his friends often," such testimony would have been cumulative of the "testimony . . . presented at trial that the victim engaged in amateur boxing matches in his free time." (*Id.*)

Ms. Hart testified at her deposition that at some point, Mr. Starks and the victim were "exchanging some words," but the victim "stated that he did not want to fight, and that, if anything, they could 'throw some gloves on and box it out.'" (*Id.* at 13). Ms. Hart was "not at the party when the fight happened," however. (*Id.*) As the court correctly ruled, "this testimony would not demonstrate that the victim was the aggressor or that [Mr. Starks] was justified in using deadly force." (*Id.*) The same is true of Ms. Lisk's testimony. She stated at her deposition that "the victim and [Mr. Starks] had at one point 'gotten in each other's faces,' but she and someone else broke it up, and everyone settled down." (*Id.*) According to Ms. Lisk, "no one touched each other at the time," and "she left the party

16

approximately thirty minutes before she received a phone call telling her that the victim

was being rushed to the hospital." (*Id.* at 13-14). A fairminded jurist could agree that Ms.

Lisk's testimony would not have aided the defense. (*Id.*)

Next, the postconviction court reasonably found no prejudice from the failure to call

Dr. Dollett White, Dr. Edward Willey, or a "biomechanical engineer." (*Id.* at 14-17). As

noted above, Dr. White performed the autopsy of the victim but was unable to testify at

trial. (*Id.* at 14). Instead, Dr. Thogmartin informed the jury that the victim died of "blunt

head and neck trauma" after sustaining at least three punches, and that the trauma caused

"axonal injury"—the severing of the "wires that lead from the brain to the body." (Doc.

35-2, Ex. 33, at 398, 405, 413). Dr. White, by contrast, believed that the victim suffered a

"tear in the vertebral artery." (Doc. 6-1, Ex. 19, at 14). Nevertheless, as the postconviction

court explained, both Dr. White and Dr. Thogmartin "testified that the victim's cause of

death was blunt force trauma, where the victim was hit multiple times." (*Id.*) In other

words, "although Dr. White and Dr. Thogmartin both had different theories regarding the

exact source of blood at the base of the victim's brain, both determined that the ultimate

cause of his fatal injuries was blunt head and neck trauma." (*Id.* at 15). On this record, a

fairminded jurist could conclude that there was no "reasonable probability that the outcome

of the trial would have been different had counsel called Dr. White to testify."[3] (*Id.*)

---

[3] Dr. White also opined that the victim had "injuries to [his] hands." (Doc. 6-1, Ex. 19, at 14). But Mr.
Starks suffered no prejudice from the failure to present this testimony at trial, because Dr. Thogmartin
"testified on cross-examination that the victim had abrasions on his knuckles that would be consistent with
punching someone." (*Id.*) Moreover, "no witnesses testified that the victim struck [Mr. Starks]. In fact, all
of the witnesses that were present when the attack began testified that the victim was sitting in a chair at
the time [Mr. Starks] repeatedly struck him." (*Id.*)

As for Dr. Willey—the "defense's retained medical expert"—the postconviction court correctly found no "reasonable probability that the outcome of the trial would have been different had counsel called [him] to testify." (*Id.* at 15-16). As the court explained, "Dr. Willey's alleged theory regarding a torn vertebral artery, which appear[ed] to line up with Dr. White's opinion, [was] not inconsistent with blunt force trauma, the ultimate cause of death, as determined by both Dr. White and Dr. Thogmartin." (*Id.*) Because Dr. Willey would not have refuted the finding of blunt force trauma—and in light of "all the eyewitness testimony about the attack"—a fairminded jurist could conclude that Mr. Starks suffered no prejudice from the failure to call Dr. Willey. (*Id.* at 16).

Lastly, the postconviction court reasonably found that Mr. Starks "failed to demonstrate that the outcome of the trial would have been different had counsel called" a "biomechanical engineer." (*Id.*) According to Mr. Starks, such an expert could have testified that "a rupture of a vertebral artery can happen from the following: a sudden injury to the neck, a sudden movement, a sudden turn of the neck, whiplash, being dropped, a fall, or a cough." (*Id.*) In addition, the expert allegedly would have "testified that a diffused axonal injury is more likely to be caused by a fall or being dropped than by punches." (*Id.*) But as the court pointed out, the victim's "cause of death was certified as blunt head and neck trauma," and "[m]ultiple witnesses testified that [Mr. Starks] repeatedly struck the seated, unconscious victim in the head and neck." (*Id.*) Significantly, no "witnesses were presented to testify that the extensive injuries the victim received were caused by any other events, such as a fall" or a cough. (*Id.*)

18

Moreover, Mr. Starks fails to identify any "biomechanical engineer" who could have provided the testimony he describes. Nor has he shown that any such expert "actually reviewed the evidence in his case." *Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir. 2016). "Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with [Mr. Starks's] claims is mere speculation and does not entitle him to habeas relief." *Id.* Mr. Starks's speculative allegations are insufficient to establish prejudice. *See, e.g.*, *Holt v. Sec'y, Fla. Dep't of Corr.*, 489 F. App'x 336, 338 (11th Cir. 2012) (state court reasonably rejected ineffective-assistance claim based on failure to retain expert because "[i]t [was] speculative that an expert witness would in fact have testified" favorably to the defense); *Jimenez v. Sec'y, Dep't of Corr.*, No. 8:19-cv-684-MSS-AEP, 2021 WL 5416150, at *9 (M.D. Fla. Nov. 19, 2021) ("[I]n his post-conviction motion, [petitioner] neither identified an expert who could have testified [favorably to the defense] nor presented an affidavit or testimony to substantiate that testimony. Because [petitioner's] ineffective assistance of counsel claim was speculative, the state court did not unreasonably deny the claim.").

### D.    Ground Five—Response to Jury Question

Mr. Starks contends that the trial court violated his right to due process when it addressed a jury question about the elements of second-degree murder. (Doc. 1 at 13). Under Florida law, second-degree murder is "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." Fla. Stat. § 782.04(2). "As explained in the standard jury

19

instructions"—which the jury in this case received—"[a]n act is 'imminently dangerous to another and demonstrating a depraved mind' if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite, or an evil intent, and (3) is of such a nature that the act itself indicates an indifference to human life." *Light v. State*, 841 So. 2d 623, 625 (Fla. 2d DCA 2003).

The jury in Mr. Starks's case (1) asked the trial court for "the definition of 'ill will, spite, and evil intent,'" (2) requested "original depositions of all taken by police" as well as various medical reports, and (3) asked for the definition of "serious bodily injury." (Doc. 35-2, Ex. 33, at 507). With the parties' consent, the court gave the following answer:

> Thank you, Ladies and Gentlemen. I did receive your questions. In answer to each of them—well, the first one, I—you have received all of the instructions in this case that there are. And that's—that's all you have. You have to rely on your collective decisions and impressions.
>
> As to the request for depositions and reports, those are not—again, you have received everything that is permissible under the rules.
>
> And, likewise, the definition of—to the third question, you have got everything that—all of the law that pertains to this case.
>
> So, that's—that's it.
>
> All right. So, please try to do your best with what you got.

(*Id.* at 508-09).

Mr. Starks argues that the court erroneously instructed the jury to rely on its "collective decisions and impressions" in considering the meaning of "ill will, spite, and evil intent." (Doc. 1 at 13; Doc. 35-2, Ex. 33, at 508). According to Mr. Starks, this

20

instruction "told the jury [it] not only determined the facts of the case but the law that applied to those facts." (Doc. 1 at 13).

Respondent argues that Mr. Starks's due process challenge is procedurally defaulted, but the Court need not reach that issue because the claim fails on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

"A jury instruction that is incorrect under state law is not a basis for habeas relief." *Sanchez v. Sec'y, Fla. Dep't of Corr.*, 819 F. App'x 675, 677 (11th Cir. 2020) (citing *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)). Instead, the question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. "It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Id.* "In addition, . . . [federal courts] inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id.* The inquiry does not focus on "whether the challenged instructions were undesirable, erroneous, or even universally condemned." *Jamerson v. Sec'y, Dept. of Corr.*, 410 F.3d 682, 690 (11th Cir. 2005).

Mr. Starks cannot satisfy this demanding standard. In response to the jury's request for a definition of "ill will, spite, and evil intent," the trial court said, "[Y]ou have received all of the instructions in this case that there are. And that's—that's all you have." (Doc. 35-2, Ex. 33, at 508). The court did not err "by directing the jury to review relevant portions of its original, and correct, instructions." *United States v. Zayas*, 141 F.4th 1217, 1230

21

(11th Cir. 2025); *see also United States v. Bailey*, 830 F.2d 156, 157 (11th Cir. 1987) (rejecting argument that "the judge erred by referring the jury back to the earlier jury instructions rather than directly responding to the jury's questions").

The court also said that the jury "ha[d] to rely on [its] collective decisions and impressions." (Doc. 35-2, Ex. 33, at 508). Mr. Starks does not cite—and this Court cannot locate—any authority suggesting that this instruction violated due process. In effect, the jury was told to use its common sense and experience in interpreting the meaning of "ill will, spite, and evil intent." "To supplement otherwise adequate instructions with admonitions to use common sense is merely explicit judicial recognition of the fact that a jury may and will call upon its common experience in affairs of life" during deliberations. *United States v. Marino*, 562 F.2d 941, 945 (5th Cir. 1977). Thus, the "mere insertion of remarks about the use of common sense as a valuable tool in the deliberative process" does not violate due process. *Id.* at 944; *see also Sairras v. Fla. Dep't of Corr.*, 496 F. App'x 28, 34 (11th Cir. 2012) (counsel not deficient for failing to object to "appropriate" response to jury question urging "jurors to use their experience and common sense to interpret" the term "distribution").

### E.   Ground Six—Failure to Establish "Time Lapse" Between Attack and 911 Call

Mr. Starks faults trial counsel for failing to establish the amount of time that elapsed between his attack on the victim and the 911 call. (Doc. 1 at 14). According to Mr. Starks, the attack "took place no later than 12:10 a.m.," but the 911 call was "not placed until 12:58 a.m." (*Id.* at 15). Mr. Starks argues that this gap shows the victim was "not in as bad shape

as" the prosecution argued at trial. (*Id.*) He also says it demonstrates that the guests "could have caused the fatal injury" by "moving" the victim. (*Id.*)

Mr. Starks correctly concedes that this claim is procedurally defaulted because he failed to raise it in state court. (Doc. 43 at 19). Thus, he cannot obtain relief "unless [he] can demonstrate cause for the default and actual prejudice, or that he is actually innocent." *Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013). Mr. Starks seeks to excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012). (Doc. 43 at 19). *Martinez* held that a petitioner may establish cause for the default of a claim of ineffective assistance of trial counsel where (1) "in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective," and (2) the defaulted claim is a "substantial one," meaning that it "has some merit." *Martinez*, 566 U.S. at 14. A claim is "insubstantial" if it is "wholly without factual support." *Id.* at 16.

*Martinez* does not excuse the default because Mr. Starks's ineffective-assistance claim is not "substantial." *Id.* at 14. Even if the partygoers waited approximately fifty minutes to call 911, it does not follow that the victim's condition was better than the prosecution said it was, or that the guests "could have caused the fatal injury" by "moving" the victim. (Doc. 1 at 15). One witness testified that within "a matter of seconds" the victim "started turning blue and swelling up." (Doc. 35-2, Ex. 33, at 280). Another witness stated that the victim "automatically turned blue in the face," with "blood . . . coming out of his nose and mouth." (*Id.* at 206). And a third witness said that after separating Mr. Starks and the victim, he observed that the victim was unconscious, "limp" in the chair, and not "breathing normally." (*Id.* at 229-30). Any delay in calling 911 does not negate this

23

unrebutted testimony. In addition, Dr. Thogmartin opined that "in and of itself, a move wouldn't affect [the victim] at all." (*Id.* at 407). Therefore, Mr. Starks cannot establish a "reasonable probability" that, had the jury learned of the alleged time lapse, "the outcome at trial would have been different." *Reed*, 767 F.3d at 1261.

### F.   Ground Seven—Failure to "Obtain Full Discovery" and Convey Time Limit on Plea Offer

Finally, Mr. Starks argues that trial counsel mishandled the State's plea offer of fifteen years' imprisonment. (Doc. 1 at 17). He does not claim that he was unaware of the offer. Instead, Mr. Starks alleges that he could not properly evaluate it because he lacked access to "full discovery"—specifically, the "EMT report" and photographs of the deceased victim. (*Id.*; Doc. 35-3, Ex. 53, at 7-8). Mr. Starks also faults counsel for failing to inform him that there was a "time limit on the plea [offer]." (Doc. 1 at 17). Had counsel provided him "full discovery" and told him about the time limit, Mr. Starks allegedly would have accepted the fifteen-year offer. (*Id.*)

The postconviction court rejected this claim, finding no "reasonable probability that [Mr. Starks] would have accepted an offer of fifteen years if such an offer was indeed extended to him." (Doc. 6-1, Ex. 19, at 6). As the court noted, Mr. Starks did "not indicate the exact date the State presented the alleged fifteen-year offer." (*Id.* at 5). But because he alleged that the offer came while he was represented by his first attorney, the court found that "it would have been sometime between September 6, 2011, the date [the first attorney] was appointed to represent [Mr. Starks], and May 15, 2013, the date he was allowed to withdraw from the case." (*Id.*) According to Mr. Starks's allegations, the offer remained

24

open until at least March 6, 2014, when his second attorney withdrew and was replaced by the attorney who represented him at trial. (*Id.*; *see also* Doc. 35-3, Ex. 53, at 7). Based on this timeline, the court found that the fifteen-year offer "was on the table for at least ten months"—between May 2013 and March 2014. (Doc. 6-1, Ex. 19, at 6). At some point after the appointment of his third attorney, Mr. Starks allegedly tried to accept the offer, but he was told it was "off the table." (Doc. 35-3, Ex. 53, at 8).

The court ultimately held that "the evidence . . . counsel failed to provide" Mr. Starks—"the EMT's report and photographs of the victim"—did "not strengthen the State's case to such a degree that would demonstrate a reasonable probability that their revelation would have caused [him] to accept the State's offer." (Doc. 6-1, Ex. 19, at 6). The court noted that in October 2013—when the fifteen-year offer was still available—Mr. Starks wrote a letter to the trial court proposing a ten-year offer. (*Id.* at 5-6). In that letter, Mr. Starks "detail[ed] what the discovery, including the results of the autopsy, revealed." (*Id.* at 6). He wrote that he "struck the victim in the face with a series of punches while the victim was seated," that "[a]ccording to everyone present, the first punch knocked the victim out," and that "the medical examiner had determined the victim died as a result of a ruptured vertebral artery." (*Id.*) Given "the evidence available to" Mr. Starks during the ten months the offer was pending, the court found no reasonable probability that he "would have accepted" the offer had counsel provided him the EMT report and the photographs. (*Id.*)

This ruling was reasonable. "[C]laims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland.*" *Missouri v. Frye*,

25

566 U.S. 134, 140 (2012). To establish prejudice from a lost plea offer, the petitioner must show that, "but for the ineffective assistance of counsel, a reasonable probability existed that: (1) the plea offer would have been presented to the court (*i.e.* the [petitioner] would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances); (2) the court would have accepted its terms; and (3) under the offer's terms, the conviction or sentence, or both, would have been less severe than under the judgment and sentence that were, in fact, imposed." *Carmichael v. United States*, 966 F.3d 1250, 1259 (11th Cir. 2020). As noted above, this Court must determine "whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Starks]— that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin*, 89 F.4th at 1317.

Mr. Starks fails to make the necessary showing. A fairminded jurist could agree that, even if Mr. Starks had received "full discovery" and known the fifteen-year offer had an expiration date, there was no "reasonable probability" he "would have accepted" it. *Carmichael*, 966 F.3d at 1259. Mr. Starks does not explain how the EMT report or the photographs would have affected his assessment of the State's case. In any event, the EMT report was not admitted at trial, and the photographs of the deceased victim were not an important part of the State's presentation. As the postconviction court pointed out, Mr. Starks's letter showed that even when the offer was still available, he understood the key aspects of the State's case—that he "struck the victim in the face with a series of punches while the victim was seated," that "[a]ccording to everyone present, the first punch knocked

the victim out," and that the medical examiner found that the victim died of blunt force trauma. (Doc. 6-1, Ex. 19, at 6). Despite his knowledge of this evidence, Mr. Starks did not accept the fifteen-year offer, instead proposing a ten-year counteroffer. "Given [Mr. Starks's] awareness of the plea offer [and the most important evidence against him], his after the fact [allegation] concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer."[4] *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991); *see also Martin v. Sec'y, DOC*, 347 F. App'x 485, 493 (11th Cir. 2009) ("[T]he state court's determination that [petitioner] would not have accepted the 10-year plea deal if he had known about the expiration date is not clearly erroneous.").

## IV.    Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. Starks's petition (Doc. 1) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Starks and to **CLOSE** this case.

3. Mr. Starks is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only

---

[4] Mr. Starks seeks an evidentiary hearing on his claims. The Court concludes that an evidentiary hearing is not warranted. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (stating that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing"); *Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record.").

if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Starks must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Starks has not made the requisite showing. Because Mr. Starks is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on May 29, 2026.

_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

28